**THIRD DIVISION**
**ANDREWS, P. J.,**
**DILLARD and MCMILLIAN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**March 20, 2014**

# In the Court of Appeals of Georgia

A13A1737; A13A1738. TARGET CORPORATION v. KENNON AMERSON d/b/a SOUTH COAST BUILDERS ET AL.; GREEN ET AL. v. KENNON AMERSON d/b/a SOUTH COAST BUILDERS ET AL.

DILLARD, Judge.

In these companion cases, Charlotte and Micah Green and Target Corporation appeal from a verdict in which the jury concluded that the Greens and Target conspired to convey a piece of real property with the intent of defrauding Kennon Amerson d/b/a South Coast Builders and South Georgia Coast Builders, LLC (collectively, "Amerson"), a judgment creditor of the Greens. The Greens and Target assert that (1) Amerson failed to present any evidence of fraud and, therefore, they are entitled to judgment as a matter of law (*i.e.*, that the trial court erred in denying their motions for directed verdict); and (2) Amerson's judgment lien was improper

and the trial court erred in failing to rule on that issue. And because we agree that the evidence is insufficient to sustain the jury's verdict of fraudulent conveyance as a matter of law, we reverse the judgment.

The facts of this case are essentially uncontroverted. In January 2007, the Greens contracted with Amerson, a general contractor, for the construction of their home in McIntosh County, Georgia (the "Property"). Thereafter, a dispute between the parties arose, and in December 2007, Amerson filed suit against the Greens.

At all times relevant to this case, Charlotte Green was employed by Target. And in the fall of 2008, Charlotte—who transferred to Georgia for the purpose of opening a distribution center—was approached by her manager and asked if she would be willing to relocate to North Carolina to open yet another distribution center. Charlotte had not tendered her name for consideration when Target announced the job opening, but her manager nonetheless asked her to consider taking the position based upon her success in opening the Georgia facility. She expressed some interest in the move, and agreed to discuss the matter further with her husband. Charlotte also informed her manager (during this same conversation) that she was engaged in ongoing litigation with Amerson, indicating that she would need to explore what impact, if any, the litigation would have on her ability to relocate.

Before making a final decision to accept the position in North Carolina, Charlotte consulted with Target's relocation department, a team dedicated to providing assistance to Target's relocating employees. And this consultation resulted in an agreement to appraise the Greens' Property in order to assess the feasibility of such a move. Specifically, the relocation department placed the Greens in contact with Target's relocation agent, Plus Relocation Services, Inc. ("Plus Relocation"), with whom Target contracted for the real-estate component of its relocation packages—*i.e.*, to aid employees in establishing the value of their homes, to assist them in selling their homes, and/or to facilitate Target's buyout of their homes, so as to allow employee relocation without extensive delay.[1] Then, in November 2008, Plus Relocation obtained two separate appraisals on the Greens' Property; and, after averaging the two, it determined the fair-market value of the Property to be $356,000.[2]

---

[1] Target employs approximately 380,000 individuals nationwide. In addition to aiding relocating employees with the sale of their homes, Target's relocation package funds the shipping of household goods, pays for closing costs and real-estate fees, and provides small, lump-sum payments to cover miscellaneous expenses.

[2] Amerson does not dispute that $356,000 represented the fair-market value of the Greens' Property.

And while the appraisal value of the Property was nearly *$26,700 less* than the payoff price (due to an outstanding construction loan), Charlotte, nevertheless, decided to pursue the relocation. She then accepted the position, and was directed to report to work in North Carolina in February 2009.

In accordance with its standard relocation package, Target offered to purchase the Property from the Greens at the appraised fair-market value after the house was listed but failed to sell in 60 days. Then, in January 2009, Plus Relocation, on behalf of Target, ordered a title search on the Property and determined it to be free and clear of all liens and encumbrances (other than the Greens' construction loan). The Greens were also informed that the delivery of an unencumbered title was a prerequisite to any sale.

But before the relocation was complete, the case between the Greens and Amerson went to a jury trial and, on February 5, 2009, Amerson obtained a money judgment against the Greens. The Greens filed a motion for new trial and subsequently appealed the judgment.[3]

Immediately after the trial, Charlotte informed both Target and Plus Relocation of the judgment. And acting upon the advice of her legal counsel, she also informed

---

[3] The jury's verdict was upheld by this Court in an unpublished opinion.

4

them that the judgment was a monetary one against the Greens personally and did not impede the Greens' ability to convey unencumbered title to the Property.

On March 26, 2009, Amerson filed its judgment lien on the general-execution docket in McIntosh County during the pendency of the Greens' motion for new trial. Then, on March 30, 2009, Plus Relocation, on behalf of Target, ordered a revised title search on the Property in preparation for its purchase of the Property. Apparently due to the lag between the time of filing and the time it takes to appear on the docket, Amerson's lien was not discovered during the revised title search, and the title analysis indicated that title on the Property remained clear.

Thus, unaware of the judgment lien, Plus Relocation, on behalf of Target, purchased the Property on May 4, 2009 for $356,000.[4] And because Target's purchase price was less than the payoff value of the construction loan, the Greens—who had already moved to North Carolina—paid the remaining loan balance of nearly $26,700 at closing.

The Greens relinquished all possession and control of the Property to Target at the time of the closing and, indeed, have not returned to the Property since moving

---

[4] Target's policy was to service, as opposed to pay off, the primary mortgages of its relocating employees. But as was its policy with all loans other than primary mortgages, Target paid off, rather than serviced, the Greens' construction loan.

5

to North Carolina several months prior to the closing. Then, on September 1, 2009, when Target attempted to sell the Property, it discovered for the first time Amerson's judgment lien. Target was thereafter precluded from effecting a third-party sale.

Target filed a petition to quiet title on the Property[5] and, on the same day, Amerson filed the instant action. In that complaint, Amerson alleged that (1) the Greens fraudulently transferred the Property to Target for the purpose of avoiding its judgment and requested that the sale be set aside, and (2) Amerson should be awarded bad-faith damages and attorney fees for the Greens and Target's alleged deceitful conduct. And during the ensuing trial, the Greens and Target twice moved for directed verdict, contending that (1) the evidence was insufficient as to establish the essential elements of fraud, so as to support a finding of fraudulent conveyance and (2) Amerson's judgment lien was improper because it was filed during the pendency of the Greens' motion for new trial in their litigation with Amerson. The trial court denied both motions.[6]

_____

[5] The trial court issued an order staying the quiet-title action pending the final resolution of this case.

[6] The trial court also denied the Greens and Target's motions for summary judgment, and this Court denied their applications for interlocutory appeal.

The jury returned a verdict in favor of Amerson on the fraudulent-conveyance claim, finding that the warranty deed from the Greens to Target should be set aside, that the Greens and Amerson acted with bad faith, and that Amerson was entitled to attorney fees against Target. No ruling was made as to the validity of the judgment lien.

On appeal, the Greens and Target assert that the trial court erred (1) in allowing the issue of fraudulent conveyance to go to the jury, and not granting their motions for directed verdict, and (2) in failing to rule upon the validity of the judgment lien.

1. With respect to the Greens and Target's argument that the trial court erred in denying their motions for directed verdict on the claim of fraudulent conveyance, we note that a directed verdict is proper only if "there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, . . . demand[s] a particular verdict."[7] Amerson, of course, bore the burden at trial of presenting sufficient evidence to establish fraud,[8] and we review the trial court's denial of the Greens and Target's motions for directed verdict using the any

_____

[7] OCGA § 9-11-50 (a).

[8] *Sun Nurseries, Inc. v. Lake Erma, LLC*, 316 Ga. App. 832, 835 (1) (730 SE2d 556) (2012).

7

evidence standard.[9] With these guiding principles in mind, we turn now to merits of this enumeration of error.

The Georgia Uniform Fraudulent Transfers Act[10] ("UFTA") proscribes transfers made "[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor."[11] OCGA § 18-2-74 (b) lists several factors—also called "badges of

---

[9] *See Honester v. Tinsley*, 183 Ga. App. 146, 148 (2) (358 SE2d 295) (1987).

[10] *See* OCGA § 18-2-70 *et seq.*

[11] OCGA § 18-2-74 (a) (1). Amerson presented no evidence that the transfer was fraudulent under OCGA § 18-2-74 (a) (2), which prohibits transfers made

> [w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor . . . (A) [w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (B) [i]ntended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

8

fraud"[12]—that "consideration may given [to], among other factors," in determining whether a fraudulent transfer has been made with actual intent to defraud a creditor:

(1) [t]he transfer or obligation was to an insider; (2) [t]he debtor retained possession or control of the property transferred after the transfer; (3) [t]he transfer or obligation was disclosed or concealed; (4) [b]efore the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) [t]he transfer was of substantially all the debtor's assets; (6) [t]he debtor absconded; (7) [t]he debtor removed or concealed assets; (8) [t]he value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) [t]he debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) [t]he transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) [t]he debtor transferred the

---

[12] *See BFP v. Resolution Trust Corp.*, 511 U.S. 531, 540-541 (114 SCt. 1757, 128 LEd2d 556) (1994) ("The modern law of fraudulent transfers had its origin in the Statute of 13 Elizabeth, which invalidated 'covinous and fraudulent' transfers designed 'to delay, hinder or defraud creditors and others.' . . . English courts soon developed the doctrine of 'badges of fraud': proof by a creditor of certain objective facts (for example, a transfer to a close relative, a secret transfer, a transfer of title without transfer of possession, or grossly inadequate consideration) would raise a rebuttable presumption of actual fraudulent intent.") (citation omitted); *Sun Nurseries*, 316 Ga. App. 832, 839 (730 SE2d 556) (2012) (referring to the eleven nonexclusive factors delineated in OCGA § 18–2–74 (b) as "badges of fraud.").

essential assets of the business to a lienor who transferred the assets to an insider of the debtor.[13]

Amerson contends that this case implicates evidence of fraud as set forth in factors 1, 2, 3, 4, 5, 6, 7, 9 and 10. We disagree.

(a) Without citing to any authority or record evidence, Amerson asserts that Target, as Charlotte's employer, is an "insider" within the meaning of OCGA § 18-2-74 (b) (1). As defined in the UFTA, however, an "insider" includes an individual debtor's relatives, partners or partnerships, or "[a] corporation of which the debtor is a director, officer, or person in control."[14] The record contains no evidence that Charlotte was "a director, officer, or person in control" at Target. To the contrary, Charlotte testified that, at no time during the relevant time period, was she employed in an executive or managerial position with any authority or control over Target's actions with respect to the direction of money or the purchase/sale of the Property.[15]

_____

[13] OCGA § 18-2-74 (b); *see also SRB Inv. Servs., LLLP v. Branch Banking & Trust Co.*, 289 Ga. 1, 4 (2) (709 SE2d 267) (2011).

[14] OCGA § 18-2-71 (7) (A).

[15] For that matter, there is no evidence that Charlotte was a "person in control" of Target within the meaning of the statute.

It follows, then, that Amerson failed to set forth any evidence to support its assertion that Target was an "insider" within the meaning of OCGA § 18-2-74 (b) (1).[16]

(b) In support of its contention that the Greens retained possession or control of the Property after the sale to Target (thus implicating OCGA § 18-2-74 (b) (2)), Amerson notes that, although the closing took place on May 4, 2009, the Greens did not transfer the warranty deed to Target until January 7, 2010. To be sure, a delay in transferring the warranty deed might, in some circumstances, support an inference of fraud.[17] But here, the uncontroverted evidence shows that the Greens left the Property in March 2009 and never again returned. Moreover, following the closing, the Greens completely relinquished all control over the Property, and Plus Relocation assumed responsibility for the upkeep and payment of all taxes and maintenance.

---

[16] *Compare Merrell v. Beckwith*, 263 Ga. 779, 781 (439 SE2d 488) (1994) (recognizing that "conveyances between near relatives are to be scrutinized closely and slight evidence of fraud shown between them may be sufficient to set the transaction aside"); *Lawson v. Athens Auto Supply & Elec., Inc.*, 200 Ga. App. 609, 613-14 (6) (409 SE2d 60) (1991) (conveyances made between debtor's corporate alter-egos provided evidence of intent to defraud).

[17] *Compare Merrell*, 263 Ga. at 781 (evidence that debtor remained in possession of the property for eight years after the transfer to her grandson raised a question of fact for the jury and supported a finding of fraudulent conveyance); *State Housecraft, Inc. v. Jones*, 96 Ga. App. 182, 186 (1) (99 SE2d 701) (1957) (evidence of debtor's continued possession and use of the subject property after transfer authorized the trier of fact to infer fraud).

11

Additionally, while the delay in transferring title to the Property might seem unusual at first blush, Target explained that, as was the case with most corporate relocations, its customary practice dictated that it not assume title to properties it purchased. Instead, a title is generally held by a third-party title company until the property is sold, at which time title is transferred directly to the buyer in order to reduce the expenses of the transaction. Here, however, Target obtained title to the Greens' Property in January 2010 after its attempted third-party sale failed, in order to dispute Amerson's lien. It follows, then, that Amerson failed to set forth any evidence to support its assertion that the Greens retained possession or control of the Property after the sale to Target within the meaning of OCGA § 18-2-74 (b) (2).

(c) Amerson also maintains that the fact its judgment was obtained prior to the transfer of the Property from the Greens to Target connotes a badge of fraud under OCGA § 18-2-74 (b) (4).[18]

---

[18] In its brief, Amerson makes a vague and abstract argument that the Greens and Target concealed the transfer, thus implicating OCGA § 18-2-74 (b) (3). But at trial, Amerson conceded that no evidence of concealment existed. As such, this argument has been waived and will not be considered on appeal.

Again, we certainly recognize that there are circumstances in which the timing of a conveyance will necessarily raise suspicions as to a debtor's intentions.[19] That said, the uncontroverted evidence presented at trial was that the Greens—acting with the assistance of the same counsel who represented them at trial and supported their account of events—understood Amerson's judgment to be against them personally and not as a burden on the Property. And Target, who informed Charlotte that a clear title was a prerequisite to its buyout, conducted two title searches prior to the closing, neither of which reflected Amerson's lien. Thus, while Amerson's judgment does predate the conveyance, it is not sufficient, by itself and under these particular circumstances, to support a finding of actual intent to defraud.[20]

---

[19] *See Gerschick v. Pounds*, 281 Ga. App. 531, 533-34 (1) (b) (636 SE2d 663) (2006) (evidence supported a finding that debtor intended to defraud creditor when debtor "rush recorded" a quitclaim deed of his property to his wife after a hearing and two days prior to the entry of a judgment against him); *Kent v. White*, 279 Ga. App. 563, 565 (2) (631 SE2d 782) (2006) (finding of fraudulent intent supported by evidence that the day after judgment was entered against him, debtor recorded deed conveying property to his daughter for no consideration, debtor continued to use property, and after conveyance debtor no longer had assets sufficient to pay creditor).

[20] *See Sun Nurseries, Inc.*, 316 Ga. App. at 840 (1) (b) (holding that some evidence of a single badge of fraud, *i.e.*, that debtor may have been insolvent, standing alone, was insufficient in the absence of any other evidence of an actual intent to defraud).

13

(d) Amerson further contends that OCGA § 18-2-74 (b) (5) is implicated in the case *sub judice* because the Property was the Greens' sole remaining asset in Georgia. But even if this is true, it does not necessarily mean that "[t]he transfer was of substantially all the debtor's assets." The transfer of the Property from the Greens to Target does not equate to the Greens having no remaining assets or income subject to collection in North Carolina (from which Amerson could collect on its judgment).[21] Indeed, the Greens were not asked about any remaining assets or property at trial, nor was any evidence presented as to the absence of such assets.[22] As such, Amerson cannot establish that the transfer of the Property represented "substantially all the [the Greens'] assets" from a silent record. Amerson's reliance on this particular badge of fraud is, therefore, misplaced.

(e) With respect to OCGA § 18-2-74 (b) (6), Amerson alleges that the Greens "absconded" to North Carolina. But Amerson has presented absolutely no evidence

---

[21] *See* N.C. GEN. STAT. § 1C-1701 *et seq*. (also known as the Uniform Enforcement of Foreign Judgments Act).

[22] We note further that the fair-market value of the Property was less than the first-priority construction lien that encumbered the Property and was, therefore, not considered an asset under the UFTA. *See In re Palisades at West Paces Imaging Ctr., LLC*, 501 B. R. 896, 910 (I) (B) (Bankr. N. D. Ga. 2013) ("[T]o the extent a claim is secured by property of the debtor, the collateral is excluded from the calculation of assets . . . .").

that the Greens concealed their move to North Carolina or that their decision to move was in any way an attempt to avoid Amerson's judgment. Instead, the record shows that Charlotte accepted the North Carolina position and was in the process of moving prior to the entry of Amerson's judgment. And while it is certainly true that the underlying litigation was pending at the time of Charlotte's decision to relocate, it is undisputed that Target solicited Charlotte for the transfer and that she declined to submit her name when the position was originally posted. As such, there is simply no evidence to support a finding that Charlotte requested an out-of-state transfer fearing an adverse judgment, or that she was attempting to "abscond." Sometimes a corporate relocation really is just a corporate relocation.

(f) Amerson also asserts that, by moving to North Carolina, the Greens "removed or concealed assets," supporting an inference of fraud under OCGA § 18-2-74 (b) (7). But Amerson conceded at trial that no evidence of concealment existed. And thus again, at its core, Amerson relies on nothing more than the Greens' decision to move to North Carolina and the fact that Amerson had a judgment against them as "evidence" that the relocation was motivated by an actual intent to defraud Amerson.

But in the absence of any other evidence to support such a finding, these facts alone are insufficient.[23]

(g) Additionally, Amerson argues that the Greens were insolvent following the conveyance of the Property to Target because they have yet to pay the judgment against them, thus evincing fraud within the meaning of OCGA § 18-2-74 (b) (9). But to prove that the Greens were insolvent under the UFTA, Amerson was required to establish that, at the time of the conveyance, "the sum of [their] debts [was] greater

---

[23] *Compare Bishop v. Patton*, 288 Ga. 600, 68-09 (3) (c) (706 SE2d 634) (2011) (son's act, three days after his father was arrested for murder, of withdrawing $250,000 from the their joint bank account and taking proceeds from Georgia to Florida was evidence from which one could infer an intent to defraud victim's daughter (who filed a wrongful death action on behalf of victim's estate and heirs) when considered in conjunction with the fact that the son was an insider, the money represented nearly all of the father's assets, the father did not receive anything of value in return, the transfer and proceeds were concealed, and plaintiff's lawsuit was foreseeable), *disapproved on other grounds by SRB Inv. Servs., LLLP v. Branch Banking & Trust Co.*, 289 Ga. 1, 5 (3) (709 SE2d 267) (2011).

16

than all of [their] assets, at a fair valuation,"[24]or that the Greens were "generally not paying [their] debts as they [became] due."[25] Amerson did neither at trial.

Again, the record is devoid of any evidence as to the value of the Greens' debts or assets, or of any evidence that the Greens were not paying their debts as they became due (other than Amerson's judgment). Thus, even if we were inclined to entertain Amerson's argument that a failure to pay its judgment, in and of itself, could demonstrate that the Greens were "generally not paying" their debts,[26] Amerson still

---

[24] OCGA § 18-2-72 (a); *see Mercantile Nat. Bank v. Aldridge*, 233 Ga. 318, 321 (2) (210 SE2d 791) (1974) ("A debtor is insolvent . . . when, after such conveyance, property left or retained by the debtor is not ample to pay his existing debts.").

[25] OCGA § 18-2-72 (b); *see In re Gregg*, ___ B. R. ___, *17, 2013 WL 3989061 (Bankr. M. D. Ga., decided July 2, 2013) (noting that "Georgia case law . . . is unhelpful in determining what 'generally not paying debts as they become due' means . . . ."). *But cf. In re EM Equip., LLC*, 504 B.R. 8, 21 (D. Conn. 2013) (adopting the "generally not paying test" prescribed by 11 U.S.C. § 303(h) (1), and in doing so noting that "whether an alleged debtor is not generally paying debts as they come due requires a 'flexible' approach," one "which admits no hard and fast rules," and which uses four factors as guideposts in such an analysis: "(1) the number of unpaid claims; (2) the amount of such claims; (3) the materiality of the nonpayments; and (4) the debtor's overall conduct of its financial affairs.") (citation and punctuation omitted).

[26] *See generally In re Gregg*, ___ B. R. at *17 (recognizing that at least one court has held that the failure to pay a single creditor can be considered "generally not paying" when the creditor's claim constituted 97 percent of a debtor's debt, but noting that evidence as to a debtor's liabilities and payment history is required to

cannot make a showing of insolvency within the meaning of the statute in the absence of additional evidence as to the value of Amerson's debt within the context of the Greens' total liabilities.[27]

(h) Finally, Amerson maintains that the Greens' conveyance of the Property to Target shortly after Amerson obtained its judgment constitutes a badge of fraud under OCGA § 18-2-74 (b) (10). To be sure, as previously noted, the timing of events can, in some circumstances, give rise to an inference that a conveyance was designed to defeat the rights of a creditor. But under the facts of the case *sub judice*, no such inference is permissible.

The law is well established that the question of intent in a fraudulent conveyance case is generally one for the jury.[28] But no matter how willing we are to

---

make such a finding).

[27] *See Kelly Energy Sys., Inc. v. Bd. of Comm'rs of Clarke County*, 196 Ga. App. 519, 520-21 (1) (396 SE2d 498) (1990) (rejecting the trial court's conclusion that a contractor was insolvent based solely upon the contractor's failure to pay a single debt without evidence of the status of the contractor's accounts with other creditors).

[28] *See Powell v. Westmoreland*, 60 Ga. 572, 572 (1878) ("Whether the deed of gift was made with intent to defraud or delay creditors is a question of fact for the jury, to be gathered from all the circumstances of the case at the time the deed was made . . . .").

commit to the jury "the solution of every question of fact," when the determination of the issue "rests not on direct proof, but on circumstances, there exists a point where the inferences to be drawn cannot, as a matter of law, be sufficient to support a verdict."[29] That point was reached in this case.

The undisputed evidence reveals that the Property was conveyed to Target for purposes of Charlotte's corporate relocation, and the record presents absolutely no evidence from which a jury could infer that the conveyance was motivated by some nefarious intent to defeat Amerson's right to collect his judgment. It follows, then, that the Greens and Target were entitled to a directed verdict, and the trial court erred in denying their motions for same.[30]

---

[29] *Allen Kane's Major Dodge, Inc. v. Barnes*, 243 Ga. 776, 779 (257 SE2d 186) (1979) (punctuation omitted); *see also Gwinnett Prop., N.V. v. G+H Montage GmbH*, 215 Ga. App. 889, 891 (1) (453 SE2d 52) (1994) (noting that, when a party attempts to create a jury issue using circumstantial evidence to counter uncontradicted direct testimony as to a certain fact, "[t]he circumstantial evidence must be inconsistent with the direct testimony and must tend to establish the conclusion projected while rendering less probable all inconsistent conclusions" (punctuation omitted)).

[30] *See Moore v. Moore*, 281 Ga. 81, 86 (9) (635 SE2d 107) (2006) ("Because [appellant] failed to present any evidence from which the jury could have reasonably inferred that a specific conveyance . . . was fraudulent, we conclude that, with respect to this claim, there was no conflict in the evidence as to any material issue, and the evidence, with all reasonable deductions therefrom, demanded a verdict in favor of [appellee]."); *Albee v. Krasnoff*, 255 Ga. App. 738, 743 (6) (566 SE2d 455) (2002) (undisputed evidence presented no circumstances from which a jury could infer that

2. In light of our holding in Division 1, it is unnecessary for us to address the second enumeration of error.

*Judgment reversed. Andrews, P. J., and McMillian, J., concur.*

---

defendants acted with an intent to defraud creditors based upon the conveyance). *Compare Merrell*, 263 Ga. at 780-81 (evidence that conveyance was made to a close family member at a time when debtor had no other assets for essentially no consideration and debtor remained in possession of the property after conveyances presented a jury question as to fraudulent intent); *Bonner v. Smith*, 247 Ga. App. 419, 420-21 (1) (543 SE2d 457) (2000) (jury question presented as to intent due to suspicious circumstances surrounding conveyance).