**THIRD DIVISION**
**DOYLE, P. J.,**
**REESE and BROWN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**March 10, 2022**

# In the Court of Appeals of Georgia

A21A1192. WINDWARD CAMPUS OWNER, LLC v. GOOD NIGHT MEDICAL OF OHIO, LLC et al.

REESE, Judge.

In this voidable-transaction action, Windward Campus Owner, LLC (the "Landlord") appeals from the trial court's grant of summary judgment in favor of Good Night Medical, LLC, Good Night Medical of Ohio, LLC, Sleep Health Diagnostics, LLC (collectively, the "LLC Defendants"), Scott Hunter, and John Cates. On appeal, the Landlord argues that the trial court erred in finding that: (1) the transfers to the LLC Defendants were for reasonably equivalent value; (2) the transfers were not made with an intent to defraud the Landlord; (3) the LLC Defendants did not assume liability on the lease to the Landlord; and (4) the

Landlord's claims for conspiracy and aiding and abetting the voidable transfer were without merit. For the reasons set forth infra, we affirm.

Construed in the light most favorable to the Landlord, as the nonmoving party below,[1] the record shows the following. Defendants Hunter and Cates were the owners of Complete Health Diagnostics, Inc., and its subsidiary, Complete Health Technologies, Inc. (collectively, "Complete Health"). Complete Health conducted sleep studies and dispensed medical equipment such as CPAP (continuous positive airway pressure) machines and take-home sleep tests to patients. Complete Health had several sleep lab locations in Georgia and South Carolina.

In 2014, Complete Health entered into a 65-month lease with the Landlord for Complete Health's corporate headquarters in Alpharetta. About 10 to 15 employees worked in the office, consisting mostly of administrative staff. Complete Health conducted the actual clinical sleep studies at its sleep labs throughout Georgia and South Carolina.

In 2016, Complete Health was, according to Hunter, "going to have to close its doors and go bankrupt[.]" Thus, Complete Health hired a broker to seek financial or restructuring parties to provide capital and assist in paying operating expenses.

---

[1] See *Patterson v. Kevon, LLC*, 304 Ga. 232, 236 (818 SE2d 575) (2018).

2

Around this time, the LLC Defendants retained a separate broker to look for sleep lab companies that were interested in selling some of their medical equipment or other assets. The LLC Defendants were based in Ohio and were also in the sleep lab business, with locations in Arkansas, California, Georgia, Massachusetts, North Carolina, Ohio, South Carolina, and Texas. The LLC Defendants' broker identified Complete Health as a potential target for an asset purchase or other transaction. The parties began negotiating in April 2016. Prior to this negotiation, the LLC Defendants and Complete Health had no relationship with each other and had not conducted business together in any way.

The LLC Defendants considered, but rejected, a complete acquisition of Complete Health. The LLC Defendants did not believe that Complete Health's performance "justified taking on all of their liabilities." Chief among these liabilities were secured equipment leases to VGM Financial ("VGM") and Phillips Medical Capital ("Phillips"). These leases were secured by all of the assets of Complete Health. By September 2016, VGM informed Complete Health that it was in default and owed past due amounts of over $130,000.

In November 2016, Complete Health and the LLC Defendants entered into two principal agreements: (1) an Asset Purchase Agreement ("APA"); and (2) a Transition

3

Services Agreement ("TSA"). Under the APA, the LLC Defendants agreed to purchase most of Complete Health's assets and medical equipment. Other than the medical equipment, chief among these assets were patient records and all tangible personal property. The APA excluded Complete Health's cash on hand and accounts receivable. The LLC Defendants also agreed to assume some of Complete Health's liabilities.

Contemporaneously with the APA, in order to protect its newly acquired interest in Complete Health's assets and medical equipment, the LLC Defendants purchased from VGM its lease and secured interest in the medical equipment for $430,000. The outstanding debt on the VGM lease was approximately $539,000. The LLC Defendants filed Uniform Commercial Code ("UCC") financing statements to reflect this assignment from VGM. After execution of the APA, Phillips sued Complete Health, Cates, and Hunter for breach of contract under its medical equipment lease. In order to protects its assets, the LLC Defendants purchased from Phillips its lease and secured interest in the medical equipment. The LLC Defendants filed UCC financing statements to reflect this assignment from Phillips.

Under the TSA, the LLC Defendants agreed to provide certain transition services to Complete Health, including staffing, patient scheduling, inventory control,

4

billing, administration, and payment of equipment vendors and physicians. In exchange, Complete Health agreed to pay the LLC Defendants 98 percent of its collected revenues going forward. In its appellate brief, the LLC Defendants view this exchange as a "contractually guaranteed 2 percent profit" to Complete Health.

Following the transaction, Hunter became an executive of the LLC Defendants. Cates signed a consulting agreement with the LLC Defendants, but never performed under the agreement. Neither Hunter nor Cates acquired an ownership interest in the LLC Defendants.

In December 2016 and January 2017, Cates made two rent payments to the Landlord from the Complete Health account. Complete Health occupied the property until March 2017. In August 2017, the Landlord sued Complete Health for unpaid rental payments, and received a default judgement. By November 2017, Complete Health stopped receiving patient funds.

Between December 2016 and July 2017, Complete Health transferred approximately $382,000 to the LLC Defendants. The LLC Defendants contend these transfers represented 98 percent of Complete Health's revenues under the TSA and payments on the debt that VGM assigned to the LLC Defendants. The LLC Defendants also received $3,289,117.30 directly from insurers, Medicare, and

Medicaid for services that the LLC Defendants provided to patients under Complete Health's provider numbers. According to the LLC Defendants, it never received full compensation from Complete Health for the cost of the transition services and the VGM and Phillips debt. The LLC Defendants contend that it had a shortfall of $610,037.

In its third amended complaint, the Landlord asserted claims of, inter alia, violations of the Uniform Voidable Transactions Act ("UVTA"),[2] successor liability, and breach of contract. The LLC Defendants, Hunter, and Cates filed motions for summary judgment, which the trial court granted. This appeal followed.

"We review a grant of summary judgment de novo, construing the evidence in the light most favorable to the nonmovants and drawing every reasonable inference in their favor."[3]

> A defendant may prevail by showing the court that the documents, affidavits, depositions and other evidence in the record reveal that there is no evidence sufficient to create a jury issue on at least one essential element of plaintiff's case. . . . A defendant who will not bear the burden of proof at trial need not affirmatively disprove the nonmoving party's

---

[2] See OCGA § 18-2-70 et seq.

[3] *Patterson*, 304 Ga. at 236.

case; instead, the burden on the moving party may be discharged by pointing out by reference to the affidavits, depositions and other documents in the record that there is an absence of evidence to support the nonmoving party's case. If the moving party discharges this burden, the nonmoving party cannot rest on its pleadings, but rather must point to specific evidence giving rise to a triable issue.[4]

With these guiding principles in mind, we now turn to the Landlord's claims of error.

1. The Landlord argues that there was an issue of material fact as to whether the transfers from Complete Health to the LLC Defendants were for reasonably equivalent value.

Voidable transfers under the UVTA are broadly separated into two classifications: constructive voidable transfers and actual voidable transfers.[5] Under OCGA § 18-2-75 (a), the code section for a constructive voidable transfer,

> [a] transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the

---

[4] Id. at 235-236 (citation and punctuation omitted).

[5] See OCGA §§ 18-2-74 (a) (2); 18-2-75 (a) (providing for constructive voidable transfers); 18-2-74 (a) (1) (providing for actual voidable transfers); see also *Agricommodities v. Moore*, 359 Ga. App. 1, 2 (1) (854 SE2d 781) (2021) (applying this classification scheme to the Uniform Fraudulent Transfers Act ("UFTA"), the predecessor statute to the UVTA).

obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.[6]

Similarly, under OCGA § 18-2-74 (a) (2), a transfer is voidable as to a creditor if the debtor made the transfer

[w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
(A) [w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
(B) [i]ntended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.[7]

A showing of actual intent to hinder, delay, or defraud a creditor is not a necessary element to assert a claim of a constructive voidable transfer.[8] Rather, the essential elements of a constructive voidable transfer include showing (1) that the transfer was not for reasonably equivalent value, and (2) that the debtor was or

---

[6] OCGA § 18-2-75 (a)

[7] OCGA § 18-2-74 (a) (2).

[8] See *Truelove v. Buckley*, 318 Ga. App. 207, 211 (1) (733 SE2d 499) (2012) (considering a constructive fraudulent transfer under the UFTA).

8

became insolvent as a result of the transaction.[9] A creditor seeking to make a claim for a constructive voidable transfer under OCGA § 18-2-75 (a) must prove the elements of the claim by a preponderance of the evidence.[10]

As an initial matter, under the UVTA, "'[a]sset' means property of a debtor, but the term does not include [p]roperty to the extent it is encumbered by a valid lien[.]"[11] And a "[t]ransfer" under the UVTA only applies to assets.[12] The LLC Defendants, Cates, and Hunter contend that the UVTA does not apply to most of the asset transfers between the LLC Defendants and Complete Health because they were subject to the liens the LLC Defendants acquired from VGM and Phillips, and because the Landlord does not contend that the original transactions regarding these liens were voidable. In support of this argument, they cite *Wallin v. Wallin*, in which we held that a transfer secured by a previous security lien was not voidable, even

---

[9] See OCGA §§ 18-2-74 (a) (2); 18-2-75 (a).

[10] See OCGA § 18-2-75 (d). But see OCGA § 18-2-78 (a), (g) (1), (h) (A party seeking to invoke the defense that the transfer was for reasonably equivalent value must prove that defense by a preponderance of the evidence).

[11] OCGA § 18-2-71 (2) (A).

[12] See OCGA § 18-2-71 (16).

9

though the transfer may have been made "with nefarious intent[.]"[13] There, we reasoned that the security lien was not obtained fraudulently under the UFTA, and thus had priority over a subsequent judgment creditor.[14]

Similarly, in this case, the VGM and Phillips leases were secured liens that would have priority over the Landlord as an unsecured creditor; the amount of the liens were more than the transfers from Complete Health to the LLC Defendants; and the Landlord does not contend that the VGM and Phillips liens, when they were originally completed, were voidable under the UVTA. Accordingly, the asset transfers from Complete Health to the LLC Defendants are not subject to the UVTA.[15] Put simply, even if the Landlord voided these transactions, it would still not be able

---

[13] *Wallin v. Wallin*, 341 Ga. App. 440, 444 (1) (800 SE2d 617) (2017).

[14] See id. at 443-445 (1).

[15] See *Wallin*, 341 Ga. App. at 444-445 (1); *Mullins v. TestAmerica*, 564 F3d 386, 416-17 (5th Cir. 2009) (payment of monies that was encumbered by a valid lien was not a transfer under Texas's UFTA); see also OCGA § 18-2-83 (The UVTA should be applied and construed "to make uniform the law with respect" to other states that enact the UVTA.). But see OCGA § 18-2-78 (e) (2) (UVTA does apply to secured assets when a creditor utilizes the "strict foreclosure" mechanism of OCGA § 11-9-620); *CNH Diversified Opportunities Master Account v. Cleveland Unlimited*, 36 NY3d 1, 7 n.5 (2020) (explaining the strict foreclosure mechanisms of the UCC).

to recover from these assets because it would be secondary to the LLC Defendants' liens under the VGM and Phillips loans.

We therefore focus on the TSA, in which the LLC Defendants agreed to pay expenses associated with using Complete Health's provider numbers in exchange for 98 percent of the revenue. The record shows that the LLC Defendants received $3,289,117.30 from utilizing these provider numbers, an amount well above that of the Phillips and VGM loans.[16]

With respect to these expenses, the CEO of the LLC Defendants testified in a deposition that

> [w]e paid for space, we paid for personnel, we paid for equipment, we paid for the fee — every time that you get a test done, you have to pay a fee for that. We paid the physicians for interpreting the tests. We paid for the mail, for the marketing. We paid for sales reps going out. We paid for the billing services. We paid for the accounting. We paid for any shipping of supplies. We paid for everything.

The CEO also attested that the LLC Defendants lost money on this transaction. The Landlord has not set forth facts rebutting these assertions, or facts showing that this

---

[16] We do note, however, that even though the UVTA does not apply to the money transfers between the LLC Defendants and Complete Health, the reasoning set forth below would similarly apply to these transfers.

11

transaction — the payment of all expenses for utilizing Complete Health's provider numbers in exchange for 98 percent of the revenue — was not for reasonably equivalent value.[17] Thus, the trial court did not err in granting summary judgment on this claim.[18]

2. The Landlord argues that there was an issue of material fact as to whether Complete Health and the LLC Defendants made the transfers with an actual intent to defraud the Landlord.

Under OCGA § 18-2-74 (a) (1), the code section for actual voidable transfers, a transfer is voidable if the debtor made the transfer "[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor[.]" OCGA § 18-2-74 (b) lists several

---

[17] See OCGA §§ 18-2-74 (d); 18-2-75 (d) (providing that a creditor making a claim for a constructive voidable transfer has the burden of proving the elements of the claim by a preponderance of the evidence). But see OCGA § 18-2-78 (a), (g) (1), (h) (the transferee has the burden of proving certain defenses by a preponderance of the evidence).

[18] *Patel v. Diplomat 1419VA Hotels*, 358 Ga. App. 732, 739-740 (2) (b) (856 SE2d 340) (2021) (trial court did not err in granting summary judgment on UFTA claim where there was no evidence in the record that the transaction was not for reasonably equivalent value).

"badges of fraud[,]"[19] of which "consideration may be given, among other factors,"

in determining actual intent:

> (1) [t]he transfer or obligation was to an insider; (2) [t]he debtor retained possession or control of the property transferred after the transfer; (3) [t]he transfer or obligation was disclosed or concealed; (4) [b]efore the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) [t]he transfer was of substantially all the debtor's assets; (6) [t]he debtor absconded; (7) [t]he debtor removed or concealed assets; (8) [t]he value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) [t]he debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) [t]he transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) [t]he debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.[20]

We will address each factor in turn.

(a) *The transfer was not to an insider.* "Insider[,]" if the debtor is a corporation, means: "(i) A director of the debtor; (ii) An officer of the debtor; (iii) A person in control of the debtor; (iv) A partnership in which the debtor is a general partner; (v)

---

[19] *Target Corp. v. Amerson*, 326 Ga. App. 734, 737 (1) (755 SE2d 333) (2014).

[20] OCGA § 18-2-74 (b).

13

A general partner in a partnership described in division (iv) of this subparagraph; or (vi) A relative of a general partner, director, officer, or person in control of the debtor[.]" The LLC Defendants had no prior relationship with Complete Health and are not insiders under this definition. While Hunter later became an executive of the LLC Defendant, he received no funds as a result of the transaction, and thus also does not meet the definition of insider under the statute.

(b) *The debtor did not retain control of the property.* The evidence showed that the LLC Defendants, and not Complete Health, controlled almost all the property after the transfer. Although Complete Health did retain access to some funds, Complete Health used those funds to pay taxes and payroll.

(c) *The transfer was not concealed.* While the LLC Defendants did not directly inform the Landlord of the transactions, the LLC Defendants did file UCC statements with respect to their acquisition of the VGM and Phillips leases. The Landlord does not point to any evidence showing active concealment.

(d) *Before the transfer was made or obligation was incurred, the debtor had not been sued or threatened with suit.* In September 2016, Complete Health received a letter from the Office for Civil Rights ("OCR") stating that Complete Health had not adequately protected patient information, and offered to resolve the issue for a $1.5

14

million fine and a corrective action plan. OCR dropped the complaint after Cates informed OCR that Complete Health had no intention of staying in business and after Complete Health surrendered its Georgia corporate status. This letter from OCR does not fall within the ambit of OCGA § 18-2-74 (b) (4). After the transaction, Phillips filed suit against Complete Health, but the LLC Defendants acquired Phillips's security interest.

(e) *The transfer was not for substantially all the debtor's assets.* While Complete Health did sell the majority of its physical assets and all of its medical equipment to the LLC Defendants, Complete Health retained ownership of its cash and accounts receivable, which was in excess of $200,000.

(f) *The debtor did not abscond.* Complete Health did not abscond, but continued to work out of the premises until March 2017.[21]

(g) *The debtor did not conceal assets.* There was no evidence in the record that Complete Health removed or concealed assets.

---

[21] See *Target*, 326 Ga. App. at 741 (1) (e) (holding that the debtor did not abscond where there was no evidence that the debtor's move to a different state was to avoid an adverse judgment).

15

(h) *The transfer was for reasonably equivalent value.* As explained in Division 1 above, there was no issue of material fact as to whether the transaction was for reasonably equivalent value.

(i) *The debtor was insolvent.* Under the UVTA, "[a] debtor is insolvent if, at a fair valuation, the sum of the debtor's debts is greater than the sum of the debtor's assets."[22] "A debtor who is generally not paying his or her debts as they become due other than as a result of a bona fide dispute is presumed to be insolvent."[23] Here, Complete Health was in default under its VGM lease, and both the LLC Defendants and Cates and Hunter negotiated the transaction assuming Complete Health was insolvent. Thus, we disagree with the trial court's finding that Complete Health's insolvency was "mere conjecture[,]" as there was evidence in the record to the contrary.

(j) *The transfer did not occur shortly before or shortly after a substantial debt was incurred.* There was no evidence in the record that Complete Health incurred a substantial debt around the time of the transaction. The debts from Phillips and VGM

---

[22] OCGA § 18-2-72 (a).

[23] OCGA § 18-2-72 (b).

16

predated the transaction by several years, and the OCR did not pursue its patient privacy claim.

(k) *The debtor did not transfer the assets to a lienor who transferred the assets to an insider of the debtor.* The record does not reflect any transfer of assets to an insider of Complete Health.

While the question of intent in a voidable-transaction case is generally one for the jury, "there exists a point where the inferences to be drawn cannot, as a matter of law, be sufficient to support a verdict."[24] Here, Complete Health and the LLC Defendants engaged in an arms-length transaction for reasonably equivalent value, and the primary evidence of actual intent to defraud was Complete Health's insolvency. That does not bear the same hallmarks of fraud for which we have held

---

[24] *Target*, 326 Ga. App. at 742-743 (1) (h) (punctuation and footnote omitted).

17

that a jury question existed.[25] Thus, the trial court did not err in granting summary judgment on this claim.[26]

3. The Landlord argues that, pursuant to the APA between Complete Health and the LLC Defendants, the LLC Defendants assumed liability of the lease to the Landlord.

> The construction of contracts involves three steps. At least initially, construction is a matter of law for the court. First, the trial court must decide whether the language is clear and unambiguous. If it is, no construction is required, and the court simply enforces the contract according to its clear terms. Next, if the contract is ambiguous in some

---

[25] See *Ga. Commercial Stores v. Forsman*, 342 Ga. App. 542, 552-554 (2) (803 SE2d 805) (2017) (affirming the trial court's denial of summary judgment on an actual fraudulent transaction claim where there was evidence that the assets were transferred to an insider, the debtor concealed the transaction, and the debtor was insolvent); *Abbott Oil Co. v. Rogers*, 302 Ga. App. 439, 442 (691 SE2d 561) (2010) (reversing the trial court's grant of summary judgment on a fraudulent transaction claim where the transferee was a long-time friend of the debtors and the transferee knew that the debtors owed a substantial debt).

[26] See *Patel*, 358 Ga. App. at 739 (2) (a) (affirming the trial court's grant of summary judgment in favor of the debtors and transferee on the plaintiff's fraudulent transaction claim); *Target*, 326 Ga. App. at 743 (1) (h) (holding that the evidence warranted a directed verdict on the plaintiff's fraudulent transaction claim in favor of the debtor and transferee); *Sun Nurseries v. Lake Erma*, 316 Ga. App. 832, 840 (1) (730 SE2d 556) (2012) (affirming directed verdict in favor of the debtor because "some evidence of insolvency," standing alone, was insufficient to establish actual intent to defraud).

18

respect, the court must apply the rules of contract construction to resolve the ambiguity. Finally, if the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury. The existence or nonexistence of an ambiguity is a question of law for the court. If the court determines that an ambiguity exists, however, a jury question does not automatically arise, but rather the court must first attempt to resolve the ambiguity by applying the rules of construction in OCGA § 13-2-2.[27]

"[C]ontract disputes are particularly well suited for adjudication by summary judgment."[28]

Under the APA between the LLC Defendants and Complete Health, the LLC Defendants obtained "[a]ll of [Complete Health's] interests in certain real property leases respecting only those [b]usiness locations which are set forth on Schedule 1.2 (c)." That schedule listed eight real estate leases, including the Alpharetta office leased from the Landlord. The LLC Defendants also received all of the Complete Health's interest in the "Assumed Contracts[,]" which the APA defined as listed on Schedule 1.2 (e). Schedule 1.2 (e) only listed two of the leases from Complete Health,

---

[27] *Envision Printing v. Evans*, 336 Ga. App. 635, 638 (1) (786 SE2d 250) (2016) (citation and punctuation omitted).

[28] Id.

19

and did not include the Alpharetta office. In a section titled "Liabilities[,]" the LLC Defendants agreed to assume the liabilities "arising under the Assumed Contracts[ ]" and liabilities listed under Schedule 1.4. That schedule listed the same two leases from the Assumed Contracts, and did not include the Alpharetta office.

"In interpreting a contract, we are required to look at the whole contract and give the contract a reasonable construction."[29] The lease for the Alpharetta office was not included in the list of Assumed Contracts or assumed liabilities, and the LLC Defendants only assumed the liabilities listed under those two schedules. Additionally, the APA provided that it was not intended to grant any right or benefit to an entity that was not a party to the agreement. "In order for a third party to have standing to enforce a contract, it must clearly appear from the contract that it was intended for his benefit."[30]

Based on these facts, the trial court did not err in finding that the LLC Defendants did not assume the Landlord's lease under the APA.[31]

---

[29] *Envision Printing*, 336 Ga. App. at 639 (1).

[30] *Graham v. Cobb County*, 316 Ga. App. 738, 743 (2) (730 SE2d 439) (2012) (punctuation and footnote omitted).

[31] See *Thomas v. American Global Ins. Co.*, 229 Ga. App. 107, 109 (2) (b) (493 SE2d 12) (1997).

20

4. The Landlord argues that there is an issue of material fact on its claims of conspiracy and aiding and abetting the voidable transfers.

Assuming arguendo that a plaintiff can maintain an action for conspiracy and aiding and abetting a voidable transfer, the Landlord failed to demonstrate a voidable transfer, for the reasons set forth in Divisions 1 and 2 above. "Absent the underlying tort, there can be no liability for civil conspiracy."[32]

*Judgment affirmed. Doyle, P. J., and Brown, J., concur*.

---

[32] *Mustaqeem-Graydon v. SunTrust Bank*, 258 Ga. App. 200, 207 (6) (573 SE2d 455) (2002) (citation and punctuation omitted).