**SECOND DIVISION**
**BARNES, P. J.,**
**ADAMS and MCFADDEN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**July 12, 2012**

# In the Court of Appeals of Georgia

A12A0784. SUN NURSERIES, INC. v. LAKE ERMA, LLC., et al.   AD-036

ADAMS, Judge.

Sun Nurseries, Inc. ("Sun") appeals the trial court's order directing a partial verdict in its suit for damages arising out of an agreement to provide landscape installation services, material and labor at the Crystal Lake Golf Course ("Crystal Lake") in Henry County. We affirm for the reasons set forth below.

Sun originally filed suit against Lake Erma, LLC ("Lake Erma") and BEC Properties and Holdings, LLC ("BEC") (collectively referred to herein as the "corporate defendants") to collect on past due invoices for work it performed at Crystal Lake. Sun contended that both BEC and Lake Erma owned and developed Crystal Lake, although BEC disputed any interest in the development. The suit, as amended, asserted claims for breach of contract, quantum meruit, fraud, attorney fees

and conversion. Sun subsequently added David Black, J. P. Evans, Mark Conner, W. D. Everitt and Talon Equities, Inc. ("Talon")[1] as party defendants. Black, Evans, Conner, Everitt and Talon were all owners, operators and members of Lake Erma. Black, Evans and Conner were also members of BEC. BEC shared office space with Lake Erma, and BEC employees performed work for both companies but were paid by BEC.

The evidence at trial showed that sometime in or around 2003, Robert Mitchell Bozzone, Sun's owner, entered into discussions with Carl Vassallo, a BEC employee, about the possibility of Sun providing landscaping services for the Crystal Lake project. Bozzone later met with Evans[2] and Vassallo to finalize the terms of a verbal agreement for Sun to work on the golf course. Sun apparently provided landscaping services from late 2003 through mid-2005. At the direction of Evans and Vassallo, Sun submitted its invoices for this work to BEC, but Lake Erma issued the checks to pay the invoices. Lake Erma's records reflect that it paid Sun in excess of $238,000 for the work it performed, but Sun's records reflect that it received only around

[1] The corporate defendants, Conner and Talon made no appearance and filed no briefs in this appeal.

[2] Evans testified that he did not recall attending this meeting.

2

$210,700 in payment. At issue in the litigation were a series of six invoices that Sun submitted in 2005, which Sun contends Lake Erma did not pay in full, leaving a balance due of $30,506.88.

Kevin Burke, who performed accounting services for Lake Erma and BEC, testified that he cut a check to pay those invoices (the "First Check"), but it apparently was lost in the mail. Burke told Bozzone that the check had been lost, that he would stop payment on that check and that Lake Erma would issue another one. At trial, Burke did not recall cutting a replacement check, but he acknowledged that Lake Erma could have issued another check that was never signed. In any event, no replacement check was ever sent to Sun. Although Conner was not called as a witness at trial, he previously submitted an affidavit on summary judgment indicating that at some point, he directed that a check in the amount of $30,067.18 made out to Sun (the "Second Check") be removed from a stack of payments and then asked Burke to set up a meeting with Bozzone. Burke had no recollection of being directed to pull the Sun check from the payment process or of pulling the check himself, but he acknowledged that someone else could have done so.

Sometime in September 2005, while awaiting payment, Bozzone threatened to file a lien on the Crystal Lake property, but he testified that he did not file the lien

3

because Burke told him that Sun would be paid. Then in October 2005, Burke arranged a meeting with Bozzone, Evans and Conner to discuss the outstanding balance. Evans testified that the meeting was called because Conner and he were concerned that Sun was overcharging for the work it performed on the golf course when compared with charges from other subcontractors. Bozzone testified that Conner told him at the meeting that the Crystal Lake project was over budget and that they did not have the money to pay Sun. Conner accused Sun of overbilling. Evans offered to pay Sun $15,000 on the outstanding balance, but Bozzone refused. Bozzone said that he did not believe that Lake Erma was out of money; he just thought that Evans and Conner did not want to pay what was owed.

Sun filed the complaint in this case in February 2006. During discovery, Sun determined from Lake Erma's 2005 tax return that at some point in 2005, Lake Erma distributed a total of $8,297,003 to its members. Although the tax returns indicate that these were cash distributions, Evans said that the members instead received the distributions in cash and property. For example, Evans testified that although the tax form indicates that he received $2,103,262 from Lake Erma, only $160,000 of that distribution was in cash and the remainder was in property. And in March 2006, Lake Erma transferred 93 lots to Black and Evans, who then used the lots as collateral to

4

secure a $5.216 million loan from First City Bank in Stockbridge (the "Bank").[3] Black and Evans then transferred the proceeds of the loans and quitclaimed the lots back to Lake Erma. They did not keep any of the proceeds for themselves. Evans testified that this procedure was employed to pull cash flow out of the property to cover the 2005 distributions and for the corporation's future needs. Evans said that Black and he determined that it was "simpler" to obtain the loan themselves rather than having Lake Erma obtain the loan directly.

At trial, Sun presented the testimony of an accounting expert, who testified, based upon documentation provided by Sun, that Lake Erma's $8 million distribution rendered the company insolvent as of the end of 2005. On cross-examination, however, the expert admitted that her original analysis had valued Lake Erma's property holdings using a historical cost basis of $1,028,920, which was the property's purchase price plus development costs. After reviewing additional documents provided by the defendants, including a sales contract reflecting an actual sale of Crystal Lake lots, the expert was able to establish the market value for Lake

---

[3] Sun asserts that the Bank was owned by Everitt and Conner, but the record citations provided by Sun in support of this statement reflect only that Evans was on the Bank's board of directors at one point; that Evans, Everitt and Conner were on the Bank's loan committee at various times; that Everitt was chairman of the bank board in 2005; and that Conner owned some bank stock at one point.

Erma's property in 2005 as being in excess of $6.2 million. Using the market value in her analysis, the expert determined that Lake Erma had sufficient funds to pay its existing liabilities, with an excess of around $586,000 as of the end of 2005. Sun's expert conceded, therefore, that if the market value of Sun's property were considered, the company was not insolvent but rather was "marginally solvent."

At the close of Sun's case, the defendants moved for a directed verdict on Sun's claims. The trial court directed a verdict in favor of the individual defendants on all of Sun's claims and directed a verdict in favor of the corporate defendants on Sun's claims of fraud and conversion. The matter was submitted to the jury solely on Sun's claims of breach of contract, quantum meruit and attorney fees against Lake Erma and BEC. The jury returned a verdict in favor of Sun and against Lake Erma and BEC on those claims. No appeal was taken from this verdict or the trial court's subsequent order reducing the award of attorney fees. Sun appeals solely from the trial court's orders of directed verdict.

"A directed verdict is authorized only where the evidence, with all reasonable deductions and construed in favor of the nonmovant, demands a particular verdict. OCGA § 9-11-50 (a)." (Punctuation and footnote omitted.) *Allen v. Spiker*, 301 Ga. App. 893 (689 SE2d 326) (2009). But where "any evidence" or "some evidence"

6

exists to support a jury issue on the non-movant's claims, a directed verdict is improper. (Punctuation and footnote omitted.) Id. This Court conducts a de novo review on appeal from the grant of a directed verdict, and we will uphold a directed verdict "only if all of the evidence demands it." (Footnote omitted.) Id.

1. Sun argues that the trial court erred in directing a verdict on its fraud claims. Sun asserts that it presented at least some evidence to show (1) that Burke's statements to Bozzone that Sun would be paid, especially the statements made after Bozzone threatened to file a lien, were intended to fraudulently dissuade Sun from filing a lien; and (2) that Lake Erma's $8 million in distributions constituted a fraudulent conveyance designed to defeat the rights of its creditors in violation of OCGA § 18-2-74 (a).[4]

Sun bore the burden at trial of presenting sufficient evidence to establish each element of its fraud claims. See *Simmons v. Pilkenton*, 230 Ga. App. 900, 901 (2) (497 SE2d 613) (1998). "In order to prove fraud, the plaintiff must establish five elements: (1) a false representation by a defendant, (2) scienter, (3) intention to

---

[4] Sun also argued below that Conner misrepresented at the October 2005 meeting that Lake Erma was out of money and that Bozzone relied upon that misstatement, but Sun does not raise that claim on appeal, and we do not address it. In any event, Bozzone testified that he did not believe Conner.

7

induce the plaintiff to act or refrain from acting, (4) justifiable reliance by plaintiff, and (5) damage to plaintiff." (Citation and punctuation omitted.) *Summit Automotive Group v. Clark*, 298 Ga. App. 875, 880 (3) (681 SE2d 681) (2009). And a plaintiff's failure to establish even one of these elements entitles a defendant to summary adjudication. See *Beach v. B. F. Saul Property Co.*, 303 Ga. App. 689, 697 (2) n. 6 (694 SE2d 147) (2010) (standards for both summary judgment and directed verdict motions are the same); *Scarbrough v. Hallam*, 240 Ga. App. 829, 832 (3) (525 SE2d 377) (1999) (summary judgment appropriate where plaintiff failed to establish at least one element of fraud); OCGA §§ 9–11–50(a) and 9–11–56(c).

a. Sun asserts that it proffered evidence to support its claim that Burke intentionally misled Bozzone in order to forestall Sun's filing of a lien.[5] Sun points to evidence that it submitted invoices to BEC totalling $30,506.88 that were not paid; that Bozzone spoke with Burke within what it contends was the statutory time for

[5] Although Sun attempts to expand this claim on appeal, we will confine our consideration of Sun's argument to the assertions raised in the trial court. "This court's function is to review errors of the lower courts, not to review assertions made by appellant and brought directly to this court." (Punctuation and footnote omitted.) *Anderson v. State*, 251 Ga. App. 785 (554 SE2d 811) (2001). For example, Sun argues under its claim of misrepresentation that Conner, Evans and Burke misled Bozzone by failing to inform him in the October 2005 meeting that Lake Erma intended to make $8 million in distributions to its principals in December 2005, an allegation not raised below.

8

filing a materialman's lien and Burke said the invoices would be paid; that the check was issued and presumably lost in the mail; that Burke later indicated that a stop order would be placed on that check and another one issued; that Bozzone relied upon Burke's representations and refrained from filing a lien; that Conner caused any re-issued check from being delivered; and that Lake Erma subsequently refused to pay the invoices. We find that this evidence was insufficient to support Sun's claim of fraud.

A fraud action requires proof of a willful misrepresentation of a material fact. OCGA § 51-6-2 (a). Thus, "knowledge of the falsehood constitutes an essential element of the tort." OCGA § 51-6-2 (b). Here, absolutely no evidence exists that Burke knew the statements were false when he made them. In fact, Bozzone testified that he believed that Burke was probably telling the truth. And although "[a] fraudulent or reckless representation of facts as true when they are not, if intended to deceive, is equivalent to a knowledge of their falsehood even if the party making the representation does not know that such facts are false," id., Sun failed to demonstrate that Burke made the statement with reckless disregard for the truth or intent to deceive. Although Burke may have been aware that some concerns about the invoices existed at one point, he eventually got approval to issue the first check. And although

9

Conner and/or Evans may have asked him to arrange a meeting with Bozzone about their concerns, no evidence existed that Burke should have been aware at the time he made the statements to Bozzone that Lake Erma was not ultimately intending to pay Sun what was owed. Accordingly, Sun failed to establish the first element of its fraud claim.

Moreover, Sun failed to present evidence that Burke made these statements with fraudulent intent to prevent Sun from asserting its lien rights. Under OCGA § 44-14-361.1 (a) (2), a materialman must file his or her claim of lien within 90 days after completion of the work. Our courts have considered that the "completion of the work" occurs the last day that work was completed, service was furnished or material was delivered. See *D. C. Ecker Constr. v. Ponce Investment*, 294 Ga. App. 833, 834 (670 SE2d 526) (2008); *Womack Indus. v. B & A Equip. Co.*, 199 Ga. App. 660, 662 (1) (405 SE2d 880) (1991). The invoices submitted by Sun for work at Crystal Lake show that the last work for which Sun sought payment occurred on May 26, 2005. Sun alleged that Burke's statements were made in mid-September and early October 2005, which would have been more than 90 days after the last invoiced work.

Bozzone testified, however, that the last service Sun rendered actually occurred on July 17, 2005 when he personally traveled to the Crystal Lake site to supervise the

straightening of two trees that Sun had previously installed. He said that he performed this work for free and never submitted an invoice for it. Thus, Sun contends that Burke made the alleged misrepresentations during the period in which it could file a lien.

But Bozzone conceded that he never told Conner, Evans, Black or Everitt about his July visit. And the record contains no evidence indicating that Burke was aware of this visit. Bozzone could only testify that Vassallo knew he was on site in July, but Sun failed to demonstrate that Vassallo ever discussed the July work with Burke or anyone else at Lake Erma or BEC. The mere possibility that such conversations may have occurred is not enough to avoid summary adjudication. "While fraud may be proved by slight circumstances, it must amount to more than mere speculation." (Punctuation and footnote omitted.) *Power v. Georgia Exterminators*, 243 Ga. App. 355, 359 (1) (532 SE2d 475) (2000). Nor did Sun present any evidence that Vassallo was aware of Burke's representations. Sun failed to establish, therefore, that Burke or his superiors were or should have been aware that Sun even had existing lien rights at the time Burke made the statements. Even if Bozzone threatened to file a lien in September, no evidence exists that Burke believed that Sun had active lien rights at

11

the time and thus that he made the statements in order to forestall the filing of the lien. Thus, Sun also failed to establish the second and third elements of its claim.

Although Bozzone stated at trial that he also relied upon Vasallo's assurances that he would be paid, he did not indicate when Vassallo gave these assurances nor did Sun establish that Vassallo knew or should have known that Lake Erma did not intend to pay the invoices when he gave those assurances. Thus, Sun failed to present any evidence to support a finding that Vasallo acted with fraudulent intent. In any event, Sun did not assert in the pretrial order, nor does it argue on appeal, that Bozzone relied on Vasallo's statements in failing to file a lien.

Additionally, Sun failed to establish any culpability on the part of the individual defendants for Burke's representations. No liability arises simply by virtue of their status as members of Lake Erma:

> The law of corporations is founded on the legal principle that each corporation is a separate entity, distinct and apart from its stockholders. . . . And a member of a limited liability company similarly is considered separate from the company and is not a proper party to a proceeding by or against a limited liability company, solely by reason of being a member of the limited liability company . . . ."

(Citation omitted.) *Milk v. Total Pay and HR Solutions*, 280 Ga. App. 449, 451-452 (634 SE2d 208) (2006). Rather, "[a]n LLC member may be held individually liable [only] if he or she personally participates or cooperates in a tort committed by the LLC or directs it to be done." (Citations omitted.) Id. at 454. Sun presented no evidence to demonstrate that any of the individual defendants personally participated or cooperated in any of Burke's representations or that they directed Burke to make such representations with the intent to mislead Bozzone and Sun. Thus, the trial court properly granted a directed verdict on Sun's claims of misrepresentation.

b. Sun contends that the trial court also erred in granting a directed verdict on his claim that the 2005 distributions to the Lake Erma members constituted a fraudulent transfer in violation of OCGA § 18-2-74 (a). The pertinent portion of that statute provides that

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (1) With **actual intent** to hinder, delay, or defraud any creditor of the debtor . . . .

(Emphasis supplied.) Sun asserts that Lake Erma made the distributions with the intent to defeat the rights of its creditors, including Sun, because those transfers rendered Lake Erma insolvent. "A debtor is insolvent when, after a conveyance, property left or retained by him is not ample to pay his existing debts." (Footnote omitted.) *Word v. Stidham*, 271 Ga. App. 435, 436-437 (609 SE2d 651) (2004).

In support of its claim of fraudulent conveyance, Sun points to Bozzone's testimony that Conner said that the project was over budget and thus Lake Erma could not pay Sun the full amount of its invoices. But Bozzone himself discounted that statement, testifying that he did not believe Conner. Sun also relies upon its expert's initial conclusion that the 2005 distributions rendered Lake Erma insolvent. But Sun's expert acknowledged that her calculation of insolvency relied upon limited documentation provided by Sun and utilized a low historical value for Lake Erma's property. When the expert employed a calculation using a more current market value, she conceded that Lake Erma had $586,000 in excess of its debt obligations.

Even if the expert's initial analysis could be considered some evidence of insolvency, however, Sun failed to demonstrate that the distributions were done with an actual intent to hinder, defraud or delay Sun's collection of its debt as required by the statute. "[A]ctual intent to cause injury has been defined in a tort context to mean

14

an actual intent to cause harm to the plaintiff, not merely an intent to do the act purportedly resulting in the claimed injury. This definition of intent contains aspects of malice, perhaps a wicked or evil motive." (Punctuation omitted.) *Valades v. Uslu*, 301 Ga. App. 885, 890-891 (1) (689 SE2d 338) (2009). And OCGA § 18-2-74 (b) "lists 11 nonexclusive factors (sometimes called 'badges of fraud') that can be considered in determining whether funds were transferred with the actual intent to defraud a creditor." (Citations omitted.) *SRB Investment Svcs. v. Branch Banking and Trust Co.*, 289 Ga. 1, 3-4 (2) (709 SE2d 267) (2011).

We find that Sun did not present sufficient evidence of these badges of fraud to support a finding of actual intent in this case. Thus, Sun failed to point us to any evidence in the record showing that Lake Erma retained possession or control of the property distributed to its members; that Lake Erma concealed the distributions; that consideration or other factors surrounding the distributions indicated fraud; that Sun or anyone other creditor had sued or threatened Lake Erma with suit before they made the distributions; that the distributions represented substantially all of Lake Erma's assets (at least when the more current value of the property was considered); that the members of Lake Erma absconded after the distributions; that Lake Erma removed or concealed assets; that the transfer occurred shortly before or shortly after a

substantial debt was incurred; or that Lake Erma transferred the essential assets of the business to a lienor who transferred the assets to a Lake Erma insider. See OCGA § 18-2-74 (b) (1) - (11). And even if the expert's initial analysis can be considered some evidence of insolvency, we find that evidence standing alone is insufficient to establish actual intent. Accordingly, we affirm the trial court's grant of directed verdict on the fraudulent conveyance claim.

2. Sun further contends that the trial court erred in directing a verdict on its conversion claim under OCGA § 11-3-420. Sun bases this claim on Conner's removal of the Second Check from the payment process. Sun asserts that the Second Check somehow became its property because Lake Erma mailed the First Check and this mailing constituted sufficient delivery to grant it constructive possession of both checks. We disagree.

Under Georgia's Uniform Commercial Code, 11-1-101 et seq., the holder of a check is entitled to negotiate it, and a holder is one who has *possession* of the check. OCGA § 11-1-201 (20) (a) & 11-3-301 (i). But a person cannot reasonably obtain possession of a check when its whereabouts cannot be determined. See generally § 11-3-309 (a) (iii). Thus, pretermitting whether mailing the First Check constituted a form of delivery, that check was lost in the mail and Sun never received delivery or

16

otherwise had possession of it. In any event, no allegation or evidence exists that any of the defendants converted the First Check.

Moreover, it is undisputed that the Second Check, if it even existed, was never mailed to Sun; thus Sun has absolutely no basis to claim that check was delivered. Although OCGA § 11-3-420 (a) applies the law of conversion to a negotiable instrument such as a check, "[a]n action for conversion of an instrument may not be brought by . . . a payee or indorsee who did not *receive* delivery of the instrument either directly or through delivery to an agent or a co-payee." (Emphasis supplied) OCGA § 11-3-420 (a) (ii). Because Sun did not receive delivery of the Second Check, it has no claim for conversion:

> No conversion action lies because a payee who never had possession of the check has no interest in the check and cannot enforce it. As noted in the Uniform Commercial Code (UCC) official comments accompanying OCGA § 11–3–420, "[u]ntil delivery, the payee does not have any interest in the check. The payee never became the holder of the check nor a person entitled to enforce the check."

*Jenkins v. Wachovia Bank*, 309 Ga. App. 562, 565 (711 SE2d 80) (2011). In other words, "a payee who does not take delivery of an instrument does not have any ownership interest in the check" and "has no standing to enforce it," thus its "claims

17

based on tort fall to the ground." Id. at 566. The trial court, therefore, properly granted a directed verdict on this claim as well.

3. Sun also asserts that the trial court erred in directing a verdict in favor of the individual defendants on the remaining claims because it presented sufficient evidence to pierce the corporate veil between Lake Erma and its members. Sun contends that the March 2006 transfer of property from Lake Erma to Evans and Black for the purpose of securing a loan demonstrated a use by its members of the corporate "assets and income, interchangeably, without regard to Lake Erma's corporate identity." We disagree.

As previously noted, a limited liability corporation has a legal existence separate from its members. And evidence of an abuse of the corporate form is necessary in order to pierce this corporate veil. Thus, "[t]he plaintiff must show that the defendant disregarded the separateness of legal entities by commingling on an interchangeable or joint basis or confusing the otherwise separate properties, records or control." *Christopher v. Sinyard*, 313 Ga. App. 866, 867 (1) (723 SE2d 78) (2012). To prove the requisite commingling, a plaintiff must "show that the shareholders disregarded the corporate entity and made it a mere instrumentality for the transaction of their own affairs; that there is such unity of interest and ownership that the separate

18

personalities of the corporation and the owners no longer exist. (Citation omitted.) *Pazur v. Belcher*, 290 Ga. App. 703, 707-708 (2) (659 SE2d 804) (2008).

Here, Sun introduced no evidence to suggest that the individual defendants commingled or confused the Lake Erma's corporate records, assets, or finances with their own. Although Lake Erma transferred property to Black and Evans to facilitate a loan for the benefit of the corporation, the loan proceeds were returned immediately to Lake Erma, as was the underlying property. Black and Evans did not make personal use of the loan proceeds; rather the cash flow generated by the loans apparently allowed Lake Erma to continue operating. Sun has failed to establish that this transaction was in any way concealed or that it was not properly reflected on the corporate books and in the public record. Indeed, Sun introduced certified copies of deeds and other documentation reflecting the public nature of the transaction. We have already held that Sun failed to demonstrate that the 2005 distributions themselves were fraudulent, and Sun has not demonstrated that the distributions were otherwise illegal or improper. The mere existence of transfers or loans between a limited liability corporation and its members does not in and of it itself represent an abuse of the corporate form, especially where such transactions are properly reflected on the corporate books and in the public record. See Id. at 708 (2) (closely held

19

corporation); *Stewart Bros. v. Allen*,189 Ga. App. 816 (1) (377 SE2d 724) (1989) (closely held corporation).[6] That some part of the loan proceeds may have been used to replenish the company coffers after the 2005 distributions, and thus may have indirectly benefitted the members' own ends along with the corporation's, does not in and of itself constitute abuse of the corporate form. See *Pazur v. Belcher*, 290 Ga. App. at 709.

Absent any indication that the individual defendants commingled the corporation's finances with their own, appropriated the corporation's assets for their own personal use, or otherwise used the corporation as a "mere instrumentality" for the transaction of their own personal affairs, we conclude that the 2005 distributions and the 2006 loan transaction are insufficient to evidence a disregard by Black, Evans or the remaining individual defendants of the corporation's separate identity. Accordingly, we affirm the trial court's order directing a verdict in favor of the individual defendants on the remaining claims.

---

[6] We note that the analysis for piercing the corporate veil would be the same for a single shareholder corporation as it is for a limited liability corporation. "Sole ownership of a corporation by one person or another corporation is not a factor [in a piercing the corporate veil analysis], and neither is the fact that the sole owner uses and controls it to promote his ends." (Citations omitted.) *Soerries v. Dancause*, 248 Ga. App. 374, 375 (546 SE2d 356) (2001). In either case, the plaintiff must establish an abuse of the corporate form.

20

*Judgment affirmed. Barnes, P. J., and McFadden, J., concur.*