Brandon L. COLEMAN, Plaintiff,

v.

H2S HOLDINGS, LLC; Here to Serve Restaurants, Inc.; Oasis Outsourcing, Inc.; and Leigh Catherall, Defendants.

CIVIL ACTION NO. 1:15-CV-3563-SCJ

United States District Court, N.D. Georgia, Atlanta Division.

Signed 01/18/2017

Christopher Baker Hall, Peter Andrew Lampros, Hall & Lampros, LLP, Gary Richard Kessler, Gary R. Kessler, P.C., Atlanta, GA, for Plaintiff.

R. David Ware, Hall Booth Smith, P.C.-ATL, David Richard Kresser, Edward N. Boehm, Jr., Fisher & Phillips LLP-ATL, Atlanta, GA, for Defendant.

## ORDER

HONORABLE STEVE C. JONES,
UNITED STATES DISTRICT JUDGE

In 2015, an Atlanta restaurant empire fell apart rather suddenly. Employees at the various establishments, including plaintiff Brandon Coleman, contend they received no pay for the last week they worked. In this case and others, they seek to recover that pay from the restaurant companies (Here to Serve Restaurants, Inc. and H2S Holdings, LLC) ("H2S"), their owner (Leigh Catherall), and the firm that provided human resources services to H2S (Oasis Outsourcing, Inc.). Oasis now moves for summary judgment on all remaining claims[1] against it. Doc. 77.[2]

## I. BACKGROUND

To the dining public, H2S restaurants ran like any other business. People interested in working at those establishments filled out employment applications, sat for

---

1. When this case began, Plaintiff (at that time a former H2S employee named Mitchell Flowers, since dismissed) plied Fair Labor Standards Act and Worker Adjustment and Retraining Notification (WARN) Act claims against Oasis. Both have since been dismissed. About a month and half before the FLSA claim's disappeared, however, the Court permitted Plaintiff to file a second amended complaint. In that pleading, he asserted the claims the present motion attacks.

2. All citations are to the electronic docket, and all page numbers are those imprinted by the Court's docketing software.

interviews conducted by other H2S employees, and took instruction from H2S managers. H2S employees waited tables, cooked food, and seated guests, while managers made work schedules, approved days off, and signed invoices for food deliveries. Put differently, no one ever walked into an H2S restaurant and saw an employee with an "Oasis" name tag on.[3] Under the proverbial hood, however, the employer-employee relationship at H2S restaurants was a bit more complex than met the eye.

H2S, like many businesses, employed a third-party professional employer organization (PEO) "for payroll and other human resources services." Doc. 77–2 at 3. From 2011 until very shortly before H2S' demise, Oasis served as its PEO. Unsurprisingly, a contract governed Oasis' business with H2S.

That "Service Agreement" (Agreement) defined the relationship between Oasis, H2S, and its workers (who the Agreement refers to as "leased employees") as "co-employment," not joint employment. Doc. 63–1 at 2. It gave H2S "exclusive control over the day to day job duties of all leased employees," while Oasis assumed responsibility "for the payment of wages . . . without regard to" whether H2S paid Oasis. Id. at 3. If H2S failed to pay Oasis, however, its pay obligations only ran to what minimum wage law required. Id. In conjunction with its obligation to pay Oasis for HR services rendered,[4] H2S also agreed to "obtain and provide to Oasis at the end of each pay period records of actual time worked by each employee." Id. at 8.[5]

An entire section of the Agreement detailed the "Effect of Termination" of the Agreement. Doc. 63–1 at 8–9. "If for any reason" H2S failed to pay Oasis as agreed, Oasis had "the right to immediately terminate its performance" under the Agreement. Id. at 8. "Upon termination [of the Agreement] . . . all of the employees shall be deemed to have been laid off by Oasis and ***immediate notification of this shall be provided by [H2S]*** to employees who had been leased pursuant to this Agreement." Id. (emphasis added).

H2S, not Oasis, assumed "all federal, state and local obligations of an employer to the employees" in the event of the Agreement's termination. Id. Oasis, by contrast, was "immediately . . . released" from those obligations. Id. In fact, the Agreement made clear that "[i]t [was] the intent of the parties that, where allowed by law, they be placed in their respective positions immediately before their entry into this Agreement in the event of a termination or expiration or [H2S'] failure to pay OASIS." Id.

The Agreement also declared that it created no rights in third-parties," and that "no person not a party to th[e] Agreement may rely on any aspect of [it]." Doc. 63–1 at 9. Both Oasis and H2S had a duty to

---

**3.** As Oasis' Senior Director of Compliance, Kathy Lively, declared:

> Oasis did not interview, recruit, hire or promote any individual who worked in the H2S restaurants. Oasis did not establish the workers' pay rates and methods or job titles. Oasis did not make disciplinary or discharge decisions related to H2S employees. Oasis did not supervise any of the work performed by H2S employees. . . . H2S decided who would work in its restaurants. . . .

Doc. 77–6 at 3.

**4.** At the end of the day, H2S paid Oasis the money owed the workers, plus a premium for Oasis administering payroll, benefits, and other aspects of the employer- employee relationship.

**5.** In addition to calculating pay (and withholding and paying taxes), Oasis also provided worker's compensation insurance, liability insurance, and health benefits to H2S employees. Those aspects of the Service Agreement, however, play no role in any of Plaintiff's claims.

notify leased employees of the Agreement's termination. Id. Unlike H2S' express duty to notify workers "immediately" the Agreement's termination, however, this duty specified no timetable for notice. Id. at 8. And both parties agreed that the Agreement "shall be governed by and construed in accordance with the laws of the State of Florida." Id. at 9.

Workers at H2S restaurants never saw the Agreement. What they did see (at the time H2S hired them) was an "Employee Acknowledgments" form that outlined the relationship between H2S and Oasis insofar as it affected workers. See, e.g., doc. 77–6 at 11. Among other things, it made clear that workers had "no contract of employment with Oasis." Id. It said nothing about what would happen (who would give the worker notice that Oasis and H2S parted ways, etc.) if the Agreement terminated.

"Beginning in July 2015, H2S fell behind on its contractually required payment of [Oasis'] invoices." Doc. 77–6 at 5. Although a material breach of the Agreement and grounds for termination, Oasis chose to continue paying workers at that time. A month later, by the end of August 2015, "H2S owed Oasis approximately $1 million" for services rendered under the Agreement. Id.

As a result, Oasis, via letter dated September 3, 2015, terminated the Agreement effective August 30, 2015, with the last paychecks dated September 4, 2015. Doc. 77–6 at 29. Oasis requested that H2S, in compliance with its obligations under the Agreement (doc. 63–1 at 8), advise its "employees of the discontinuance of Oasis' services." Doc. 77–6 at 29. H2S never did so.

After the termination letter issued, H2S and Oasis continued to discuss possibly reinstating Oasis' services. See, e.g., doc. 77–6 at 33. Those discussions resulted in reinstatement for the August 30—September 13, 2015 pay period, with the Agreement to terminate on September 13. Id. at 31. Oasis never thereafter reinstated the Agreement. H2S, for its part, never told its workers that Oasis terminated the Agreement.

Oasis and H2S continued to discuss further reinstatement after September 13, 2015, and H2S eventually sent Oasis $295,-000 [6] "in the second half of September" 2015, which brought the balance it owed to approximately $765,000. Doc. 83–1 at 95. On September 30, 2015, Oasis sent H2S a letter "agreeing to provide services" under the Agreement "for the payroll period September 14, 2015 to September 27, 2015 (subject to receipt of prepayment in full and all other required performance)." doc. 77–6 at 46.

The reinstatement discussions nevertheless fell apart by October 2, 2015.[7] That same day, Oasis mailed letters to all H2S

---

**6.** It appears that H2S wired Oasis $70,000 on September 28, 2015 (doc. 77–6 at 45), and $170,000 on September 30, 2016. The record is unclear where the remaining $55,000 came from and when H2S sent it. It is clear, however, that H2S expected that money to be used by Oasis to meet payroll for the September 13–27, 2015 period (see doc. 83–1 at 103), while Oasis expected additional performance (more money) before it would process paychecks for those two weeks. See, e.g., doc. 77–6 at 47 (October 1, 2015 email from Oasis to Catherall advising her that Oasis would provide services if Catherall submitted personal financial information and a $450,000 personal guarantee, neither of which she ever agreed to).

**7.** Near as the Court can tell, H2S and Oasis were not on the same page regarding what it would take to reinstate the Agreement. H2S expected that its $295,000 payment (plus a $105,000 personal guarantee by Leigh Catherall) would constitute "prepayment in full and all other required performance." Oasis felt differently. Doc. 77–6 at 47. Regardless of who was correct, none of that impacts Plaintiff's claims against Oasis, as discussed below.

workers (Oasis' co-employees) that the Agreement terminated "effective September 13, 2015." Doc. 77–3 at 217. It further advised that the workers were "no longer covered by Oasis['] . . . worker's compensation" and that H2S was "responsible for any pay due . . . for any work performed after" the termination date. Id.

Before Oasis sent that termination notice, H2S paid the workers their wages for the pay period ending September 28, 2015. Doc. 77–3 at 78. Without warning to the workers (or customers), all H2S restaurants then shut their doors on October 5, 2015. Doc. 77–6 at 47. Plaintiff and other workers never received pay for the September 28—October 5, 2015 period. Doc. 63 at 13.

This case originally began two days later, on October 7, 2015. Doc. 1. After many intervening procedural vicissitudes, Plaintiff filed the operative complaint on March 29, 2016. Doc. 63. He asserts eight claims against Oasis: (1) breach of contract; (2) breach of contract under a third-party beneficiary theory of liability; (3) violation of Florida Statute § 468.525; (4) breach of "public and private legal duties (O.C.G.A. §§ 51–1–6 and 51–1–8); (5) fraud; (6) unjust enrichment; (7) money had and received; and (8) theft by deception, in violation of O.C.G.A. § 16–8–3. Id. at 24–37. Oasis moved for summary judgment a little more than two months later. Doc. 77.

## II. GOVERNING STANDARD

Summary judgment is appropriate when the moving party establishes that, based upon the evidence presented, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he requirement that a dispute be 'genuine' means simply that there must be more than some metaphysical doubt as to the material facts." Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 261, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations and internal quotation marks omitted). The court views the record and draws all factual inferences in the light most favorable to the nonmovant[, in this case, MVG]. Carlson v. FedEx Ground Package Sys., Inc., 787 F.3d 1313, 1317 (11th Cir. 2015). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Id. at 1318 (quoting Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997)).

Dean–Mitchell v. Reese, 837 F.3d 1107, 1111-12 (11th Cir. 2016).

## III. ANALYSIS

Before turning to the merits of Oasis' motion, the Court must address the discrepancy between the claims Plaintiff asserts and his response to Oasis' motion. That requires a bit of background.

As discussed above, when this case began, Plaintiff pled FLSA and WARN Act claims against Oasis. Both have since been dismissed, though not after the Court sanctioned Plaintiff for failing to voluntarily dismiss his WARN Act claim. See doc. 62; doc. 84 (reconsideration denied). At the same time as it imposed sanctions, the Court allowed Plaintiff to amend. Doc. 62

His theories of liability shifted at that time. No longer was this a WARN Act and FLSA case against Oasis. Instead, it became, as Oasis aptly describes it, a "kitchen sink" complaint (doc. 77–2 at 8), with a variety of state law claims stepping in to fill the void left by the exit of federal causes of action.

Now, Plaintiff shifts the target *again*. For example, despite third-party beneficiary breach of contract claims, "[t]he key question before the Court is," he insists, "*not* whether Plaintiff . . . was a third-party beneficiary of the Service Agree-

ment." Doc. 78 at 1 (emphasis added). And despite pleading violations of O.C.G.A. §§ 51–1–6, 51–1–8, 16–8–3, and Florida Statute § 468.525, Plaintiff never even mentions those counts (more on that omission later). The real issue, Plaintiff says (for the first time in this litigation), is "whether (1) an at-will employment relationship existed between Plaintiff and Oasis; and (2) whether Oasis was required to provide some type of notice to Plaintiff that he was terminated." Doc. 78 at 2.

To the extent those two issues constitute elements of the various claims Plaintiff asserts, the Court will address them. But those claims are what they are and they aren't changing. Plaintiff cannot at this late stage import new theories of liability. The Court now turns to Plaintiff's first claim against Oasis—breach of contract.

### A. Breach of Contract

■ "The elements for a breach of contract claim in Georgia are the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken." Niloy & Rohan, LLC v. Sechler, 335 Ga.App. 507, 510 n.4, 782 S.E.2d 293 (2016). But for conduct to amount to a breach there must first be a contract, which the Georgia Code defines as "an agreement between two or more parties for the doing or not doing of some specified thing. O.C.G.A. § 13–1–1.

In response to Oasis' breach of contract arguments, Plaintiff insists that Georgia and Florida law, as well as the Employee Acknowledgment, created an "at will" employment contract/relationship with Oasis; that termination of the Agreement did not end that relationship; and that Florida and Georgia law thus required that Oasis give notice to Plaintiff and others before its obligations, including pay, as an employer ended. Doc. 78 at 12–22. Implicit in that reasoning: Oasis' October 5, 2015 Agreement termination notice was inade-

quate. Its subsequent failure to pay, says Plaintiff, thus breached the at-will employment contract.

■ No actionable agreement, oral or written, between Plaintiff and Oasis exists. Only H2S and Oasis executed the Agreement. And the "Employee Acknowledgments" only states that Oasis will "be responsible to pay [workers] minimum wage" should H2S fail to pay Oasis, and only then "until Oasis' services terminate." Doc. 77–6 at 11. Those services terminated effective September 13, 2015, two weeks before the September 28–October 5, 2015 pay period for which Plaintiff seeks to recover. Id. at 31. In fact, the Employee Acknowledgments expressly states that the signing worker has "no contract of employment with Oasis." Id. at 11.

Plaintiff's contrary argument notwithstanding, Florida law has no role in determining when Georgia employees of Georgia companies qualify as at-will workers. The Agreement calls for construction using Florida law, and Oasis is apparently based in Florida, but neither of those data points mandates that Florida law determine the elements of claims, or what claims may be brought. That Agreement governs the relationship between Oasis and H2S, *not* Oasis and H2S' workers. At most, the latter relationship grew out of the Employee Acknowledgments (Oasis and the workers never had an oral agreement), which, in addition to expressly disclaiming the formation of an employment contract, never references Florida law at all. See doc. 77–6 at 11.

■ Under Georgia law, PEOs qualify as employers. O.C.G.A. § 34–7–6(d). And at-will employees can, under certain circumstances (when the employer makes an oral promise to pay), recover under a breach of contract theory. See Walker Elec. Co. v. Byrd, 281 Ga.App. 190, 191–92, 635 S.E.2d 819 (2006). Oasis does not con-

test those conclusions. Doc. 80 at 13. From that, Plaintiff reasons that Oasis had a duty to provide termination notice, which, he alleges, it failed to timely give. That argument, however, puts the notice cart before the employment horse.

Even accepting that Oasis qualified as Plaintiff's employer at some point, one must ask, when did that relationship and its attendant duties end, and what were those duties? If it ended before the week for which Plaintiff received no pay, and it did not include a notice requirement beyond that which the Agreement contained, then § 34–7–6(d) provides no safe harbor for a contract claim.

There is no dispute that the Agreement terminated effective September 13, 2015. Doc. 77–6 at 31. Negotiations to reinstate the Agreement continued after that date, but those talks ultimately failed. Oasis' status as a PEO thus ended on or about September 13, 2015. Its status as Plaintiff's statutory employer, then, also ended at that time. See O.C.G.A. § 34–7–6(a), (d).

Title 34 of the Georgia Code never specifies that employers must provide notice to an employee of that employee's termination. Plaintiff claims that such a notice requirement is "obvious," but provides nothing to support that notion. Even if true, Oasis provided notice no later than October 5, 2015.

Nothing about that timing makes Oasis' notice unreasonable. Oasis did not control the work schedules of H2S workers—H2S did. Doc. 77–6 at 3. And Oasis never told H2S to continue operations after September 13, 2015—H2S made that decision on its own. Id. Once it became clear that the Agreement would not be reinstated a second time, Oasis immediately notified all H2S workers, including Plaintiff. Doc. 77–1 at 7. Doing so at that juncture did not prejudice Plaintiff's ability to recover wages due. More importantly, it did not breach any duty Oasis owed Plaintiff.

Indeed, Oasis was the only entity that ever gave Plaintiff any notice. When it first terminated the Agreement (before it agreed to the first reinstatement), it expressly reminded H2S of *H2S's* obligation under the Agreement to provide immediate notice to its workers that the Agreement, and Oasis' role as salary payor, had ended. Doc. 77–6 at 29. H2S never, at any point, notified Plaintiff or his co-workers.

As discussed above, no contract exists between Plaintiff and Oasis. Only H2S and Oasis were parties to the Agreement. The Employee Acknowledgments expressly disclaimed that any contract existed. Doc. 77–6 at 11. And Plaintiff identifies no oral agreement with Oasis.

Plaintiff spoke to H2S employees when hired. Any agreement regarding pay came from those sources, not Oasis. Any employment contract, at will or otherwise, then, exists between Plaintiff and H2S, not Oasis. On those undisputed facts, Plaintiff's breach of contract claim must fall.

## B. Breach of Contract—Third Party Beneficiary

Plaintiff's second amended complaint alleges that the Agreement's "terms provide that Plaintiff ... [is an] intended beneficiar[y]," and that Oasis breached the Agreement by not paying wages for September 14–October 5, 2015, providing benefits for that time span, and not providing notice of the Agreement's termination. Doc. 63 at 24–25. At no point in his briefing does Plaintiff address that claim. In fact, he expressly disclaims it. See doc. 78 at 1–2 ("The key question before the Court is not whether Plaintiff ... was a third-party beneficiary of the Service Agreement....").

Regardless, a third-party beneficiary claim fails on the merits. The Agreement provides that it creates no rights in third parties. Doc. 63–1 at 9. That alone

neutralizes Plaintiff's claim because it highlights that neither Oasis nor H2S intended that the Agreement benefit workers. See Ames v. JP Morgan Chase Bank, N.A., 298 Ga. 732, 739, 783 S.E.2d 614 (2016). Intent to benefit is *the* touchstone of third—party beneficiary status. Id. Its absence precludes Count Two's success.

### C. Breach of Florida Statute § 468.525 and Breach of O.C.G.A. §§ 51–1–6, 51–1–8, and 16–8–3

■ Plaintiff also effectively abandoned Counts Four (Fla. Stat. § 468.525), Five (O.C.G.A. §§ 51–1–6 and –8), and Ten (O.C.G.A. § 16–8–3). He never responds to Oasis' arguments in favor of summary judgment on those counts. Indeed, at no point does Plaintiff even cite any of those provisions, much less discuss their alleged violation.

Even if he had, all four claims fail. First, *Florida* employment statutes have nothing to say about PEO obligations owed to workers in *Georgia*. The Agreement's choice of law provision does not change that. It simply allows that Florida law will govern the parties contractual rights, but does not import Floridian statutory rights. See Convergys Corp. v. Keener, 276 Ga. 808, 810, 582 S.E.2d 84 (2003).

■ Second, none of the three Georgia statutes that Plaintiff claims Oasis violated provides a private right of action. One is a criminal statute, see Jones v. CitiMortgage, Inc., No. 15–14853, 666 Fed. Appx. 766, 776, 2016 WL 6610208, at *7 (11th Cir. Nov. 9, 2016) ("[I]t does not appear that this criminal statute creates a civil cause of action."), and the other two "simply set forth general principles of tort law." Gobran Auto Sales, Inc. v. Bell, 335 Ga.App. 873, 877, 783 S.E.2d 389 (2016).

They authorize "the recovery of damages for the breach of a legal duty otherwise arising, though not expressly stated, under a statute or common law." Id. Since Oasis violated no such duty,[8] those statutes have no application here. Hanover Ins. Co. v. Carroll, No. 1:13–cv–01802–SCJ, 2014 WL 5472520, at *7 (N.D. Ga. Mar. 5, 2014) ("[S]upport for a claim under § 51–1–6 must be found in a legislative enactment outside of § 51–1–6."). Counts Four, Five, and Ten, then, fail.

### D. Fraudulent Concealment

■ "In a claim for fraudulent concealment, a plaintiff must prove the same five elements of a fraud claim." Hanlon v. Thornton, 218 Ga.App. 500, 502, 462 S.E.2d 154 (1995). And "[i]n order to prove fraud, the plaintiff must establish . . . (1) a false representation by a defendant, (2) scienter, (3) intention to induce the plaintiff to act or refrain from acting, (4) justifiable reliance by plaintiff, and (5) damage to plaintiff." Sun Nurseries, Inc. v. Lake Erma, LLC, 316 Ga.App. 832, 835, 730 S.E.2d 556 (2012).

Plaintiff contends that his termination "was a material fact that Oasis [intentionally] withheld" in order to induce Plaintiff to "continue working, which would enable HTS to make the $295,000 payment to Oasis." Doc. 78 at 23. He assures that he "reasonably relied on the belief that Oasis (1) would notify him if he was terminated; and (2) that Oasis would pay him his earned wages even if HTS did not pay Oasis." Id. The non-payment of those wages (obviously) damaged Plaintiff. Id.

■ Plaintiff fails to establish any of the first four elements. For starters, Oasis did not withhold notice (*i.e.*, it did not conceal

---

8. Plaintiff's second amended complaint contends that violation of Fla. Stat. § 468.525 undergirds his § 51–1–6 and –8 claims. Doc. 63 at 28–29. As discussed above, Florida employment law plays no role in this case. A violation of it thus cannot underlie the damages §§ 51–1–6 and –8 provide.

anything). As soon as it knew that reinstatement would not occur, it notified Plaintiff and the other workers. Plaintiff insists Oasis had a duty to provide notice sooner, but neither Georgia law, the Agreement (to which Plaintiff is not a party or third-party beneficiary), nor the Employee Acknowledgments create such a duty. In fact, as noted above, the Agreement makes clear that H2S, not Oasis, bore the responsibility for immediately notifying workers that the Agreement terminated.

Plaintiff also fails to provide any evidence that Oasis intended to dupe him and other workers into staying on the job so that H2S could generate enough cash flow to make the $295,000 payment. He merely points to the time line of events and invites the Court to infer nefarious intent. That's not enough, since nothing about the series of events suggests anything more than Oasis' intent to afford its business partner an opportunity to maintain their relationship.

When it became clear that H2S would not offer the performance Oasis demanded, it acted immediately to notify Plaintiff and the other workers that the Agreement terminated. In fact, it mailed notices *before* H2S shut its doors. If Plaintiff's liability theory were true (that Oasis delayed notice to keep H2S open), Oasis would have delayed notice yet more in hopes that H2S would continue operating and make additional payments towards its past-due balance with Oasis. That it did not supports an inference that Oasis had no intent to conceal anything from Plaintiff.

Finally, Plaintiff fails to offer any evidence that he justifiably relied on anything Oasis said or did. Plaintiff never saw the Agreement or had any notion of its contents. He thus could not rely on that document. The Employee Acknowledgments provided only that Oasis would pay workers regardless of whether H2S paid Oasis, but only "until Oasis's services terminated." Doc. 77–6 at 11. Plaintiff received notice that that occurred on September 13, 2015, so any reliance on Oasis to pay wages earned after that date was unreasonable. Because no genuine dispute exists as to any element of a fraud claim, Count Six fails.

### E. Unjust Enrichment

██ "A claim of unjust enrichment will lie if there is no legal contract and the party sought to be charged has been conferred a benefit by the party contending an unjust enrichment which the benefited party equitably ought to return or compensate for. The concept of unjust enrichment in law is premised upon the principle that a party cannot induce, accept, or encourage another to furnish or render something of value to such party and avoid payment for the value received." Campbell v. Ailion, 338 Ga.App. 382, 386–87, 790 S.E.2d 68 (2016).

██ Plaintiff argues that his continued work at an H2S restaurant after September 13, 2015 amounted to services performed for Oasis, that Oasis knew Plaintiff and others continued to work, and that it is thus "inequitable for Oasis to retain" the $295,000 payment from H2S instead of "paying [it] to its intended recipients." Doc. 78 at 25.

Taking a step back, Plaintiff never disputes that H2S owed Oasis over $1,000,000 when it made that $295,000 payment. Nor does he dispute that H2S continues to owe Oasis over $750,000. Under those circumstances, it's hard to see how that payment unjustly enriched Oasis whether or not H2S thought the money would go to pay workers like Plaintiff.

Also rather opaque is how Plaintiff ever performed services for Oasis. Oasis and H2S co-employed Plaintiff, but Plaintiff only performed for H2S. That his service

allowed H2S to generate revenue and in turn fulfill its contractual obligations to Oasis does not transform it into service *for* Oasis—it remains service for H2S. Without service to Oasis or enrichment (much less unjust enrichment) Plaintiff's claim fails.

### F. Money Had and Received

 "[A] claim for money had and received is comprised of the following elements: a person has received money of the other that in equity and good conscience he should not be permitted to keep; demand for repayment has been made; and the demand was refused." Carroll, 2014 WL 5472520, at *8 (quotes omitted). Plaintiff's "money had" claim centers on HTS' $295,000 payment to Oasis which, Plaintiff insists, was "for the purpose of allowing Oasis to meet the HTS restaurant payroll obligations." Doc. 78 at 24. Because Oasis kept that money instead of paying H2S workers, says Plaintiff, he "raises genuine issues of material fact" sufficient to survive summary judgment.

Not so. For one, Plaintiff has not presented any evidence that the $295,000 was, in fact, worker pay. Certainly H2S wanted it to be. Oasis, on the hand, never agreed to use the money in that way. See doc. 77-6.

 Even assuming that the money belonged to Plaintiff and other workers, he presents no evidence, or even argument, showing that he made a demand or that Oasis refused such a demand. Instead, he falls back on "it's not fair" arguments in urging the Court to allow a "money had"

claim to survive summary judgment. See doc. 78 at 24 ("Equity and good conscience should not permit Oasis to keep such funds that were earmarked for the payment of payroll."). That's not enough and Count Nine accordingly fails.

### III. CONCLUSION

All of the workers at Catherall's restaurants who worked from September 28 to October 5, 2015 without pay deserve compensation for their time. But Oasis is not the proper payor. Like his FLSA and WARN Act claims, Plaintiff's cornucopia of state law causes of action all fall short of establishing Oasis' liability. Its motion for summary judgment therefore is **GRANTED**. Doc. 77. Its motion to dismiss certain opt-in plaintiffs is **DENIED AS MOOT.**[9] Doc. 64.

**SO ORDERED,** this 18th day of January, 2017.

---

9. That motion, filed before the Court dismissed Plaintiff's FLSA claims against Oasis, sought to dismiss certain plaintiffs who failed to respond to Oasis' FLSA–related discovery requests. See doc. 64-1. Since (1) the targeted plaintiffs may have claims against other defendants, and (2) Oasis never suggests those plaintiffs failed to respond to discovery responses from other defendants, dismissal of whole plaintiffs rather than claims relevant to Oasis' un-responded to discovery requests is inappropriate. And since all FLSA claims against Oasis have now been jettisoned (not to mention Oasis itself), it has no interest in whether the plaintiffs remain or not.